## Case No. 12,640.

### SELF v. JENKINS.

[1 Hughes, 23;[1] 1 Am. Law T. Rep. (N. S.) 368; 71 N. C. 578; 6 Chi. Leg. News, 397.]

Circuit Court, E. D. North Carolina. June 18, 1874.

STATES—MONEY IN TREASURY DEVOTED TO PARTICULAR PURPOSE—MISAPPLICATION— CREDITOR—MANDAMUS.

Where money in a state treasury devoted by the state constitution to the payment of a particular indebtedness has been applied by direction of the state legislature to another purpose, and, afterwards, money comes into the state treasury which a public creditor, who was entitled to the money first unapplied, seeks to have paid to himself in discharge of his claim: *Held*, that although a court of chancery might properly have enjoined the state treasurer from the original misapplication, on bill filed in time, yet that it has no power, after the misapplication, to restrain the state treasurer from applying to the general purposes of the state subsequently received moneys, not especially dedicated by law, nor to compel the treasurer by mandamus to substitute such general funds for the moneys already improperly paid.

In equity.

WAITE, Circuit Justice. Article 5, § 5, of the constitution of North Carolina is in these words: "Until the bonds of the state shall be at par the general assembly shall have no power to contract any new debt or pecuniary obligation in behalf of the state, except to supply a casual deficit, or for suppressing invasion or insurrection, unless it shall in the same bill levy a special tax to pay the interest annually. And the general assembly shall have no power to give or lend the credit of the state in aid of any person, association, or corporation, except to aid in the completion of such railroads as may be unfinished at the time of the adoption of this constitution, or in which the state has a direct pecuniary interest, unless the subject be submitted to a direct vote of the people of the state, and be approved by a majority of those who shall vote thereon."

Article 5, § 8, is in these words: "Every act of the general assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purposes."

The Wilmington, Charlotte and Rutherford Railroad Company was incorporated in 1855, to construct a railroad from Wilmington to Rutherford. This railroad was unfinished at the time of the adoption of the constitution. By an act of the general assembly, passed on the 29th January, 1869, the capital stock of this company was increased to seven million dollars, and, in order to complete the road, the public treasurer was directed to subscribe four millions of dollars to the stock. Payment of this subscription was to be made in the bonds of the state having thirty years to run, the in-

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

terest, at six per cent., being payable semi-annually. To provide for the payment of the interest and the principal at its maturity, the act imposed an annual tax of one-eighth of one per cent. upon taxable property of the state, to be levied, collected, and paid into the treasury as other public taxes. This authorized subscription was made, and bonds to the amount of $3,000,000 delivered to the president of the company in part payment thereof. The special tax provided for was levied in 1869, and $151,491.13 collected therefrom and paid into the treasury. Out of this, $29,400 was paid on account of the interest accruing upon the bonds; but on the 20th of January, 1870, a resolution was adopted by the general assembly instructing and directing the treasurer not to pay any more until authorized by the general assembly, and he thereupon suspended the payment. On the 8th March, 1870, the general assembly repealed the act making appropriations to the railroad company, and directed all the bonds in the hands of the president to be returned to the treasurer. On the 12th of the same month, the general assembly, by a law duly enacted, directed the treasurer to use $150,000 of the special tax funds, in payment of the ordinary expenses of the state government, and to pay advances theretofore made by the board of education, and authorized him to replace the same out of the first moneys which might come into his hands by way of dividends of corporations or of taxes theretofore or thereafter to be levied. By another act, passed December 21st, 1870, he was directed to use $200,000 more of the same funds in payment of the ordinary expenses of the state government, and the appropriations for the charitable and penal institutions, and to replace the same from the first moneys paid into the state treasury from dividends or taxes levied and collected for general purposes. In obedience to these directions the treasurer used $122,091.13 of the fund collected to pay interest on these bonds for the purposes specified in the acts. On the 20th December, 1871, the treasurer was forbidden by the general assembly to apply any money collected under the revenue act of 1871 to the repayment of any moneys borrowed under the act of December, 1870. On the 3d of March, 1873, another act was passed, entitled "An act to raise revenue," and by its terms the taxes therein levied were applied to defray the expenses of the state government, and to pay the appropriations for charitable and penal institutions. A similar act, with similar application of the funds to be raised, was passed in 1874.

The plaintiff is the holder of certain of the bonds issued to the above-named railroad company, on which no interest has been paid, and in this bill he asks that the treasurer may be restrained from the payment of any moneys out of the treasury of the state, until he has replaced the $122,091.13, borrowed by him from the special tax fund, applicable to the payment of the interest on the bonds issued to the said company. The facts are all admitted by the pleadings, and the simple question presented for our determination is whether upon such facts the relief asked for can be granted. The use of the special tax fund to pay the general expenses of the state government was in violation of the constitution and therefore unlawful, but the wrong, if any exists, has been done. We are not called upon to prevent the act, but to relieve against its consequences. The first, upon a proper application made in time, we might have done. The question now is, whether, upon this application, the latter is within our power. The treasurer is a public officer. His office belongs to the executive department of the state. His duty is to execute the laws, not to make them. He, within his official sphere, carries into effect the will of the legislature, and can only do what the law permits. The courts will not by mandamus compel a public officer to do that which the law does not authorize. Neither will they restrain him from doing that which the law requires. An unconstitutional law is no law, and the court will, when properly called upon, restrain its execution, because it cannot authorize action by any one. It is for this reason that the wrongful application of this money might have been prevented. The law directing it, being unconstitutional, conferred no authority upon the treasurer to do what was required. It is quite another thing, however, to compel him in his official capacity to substitute other moneys now in the treasury for that which he has improperly used. That in substance is what we are called upon to do in this case. True, the form of the prayer is that the treasurer be restrained from paying out money from the treasury, but the real object is to compel him to retain in the treasury an amount equal to that which he has misapplied. This requires a refusal by the treasurer to pay the orders drawn upon him by the proper authorities pursuant to law. He is but the custodian of the public money. He has no discretion as to its use. It is held to be paid out and appropriated as the law directs.

The immediate question for our determination, therefore, is not whether the state should provide the means and require the treasurer to replace this fund, but whether it has so done. When the order to use the $150,000 was made, the treasurer was authorized to replace it out of the first money which came into the treasury by way of dividends or taxes. When that of the $200,000 was ordered, he was authorized to replace it from dividends and taxes for general purposes. The revenue act of 1871, however, expressly prohibited him from using for that purpose any money collected under its authority. The acts of 1873 and 1874 do not contain any such express prohibition, but they each direct that the taxes levied shall be applied to defray the expenses of the state government and to pay appropriations for charitable and penal institutions. This is the state-

ment of the special object to which the tax is to be applied, required to be made in every law levying taxes, and the constitution expressly prohibits its application to any other. While, therefore, the law does not prohibit the reimbursement of the special tax fund out of the money raised under its authority, the constitution does. The expenses on account of which the money was taken from the fund, have already been paid with the money of the state. It is true the money paid ought not to have been so used, but it was none the less on that account the money of the state. The bondholders might, perhaps, if the money still remained in the treasury, compel its application to the payment of the interest on their bonds, but until so applied it did not become their property, and remains that of the state. It is not claimed that there is now any money in the treasury, except that which has been collected from taxes levied under the revenue laws of 1873 and 1874, and it is clear to our minds that there is no existing law which requires or even authorizes the treasurer to reimburse the special fund from that. The state may be under obligation to provide for such reimbursement, but the state and the treasurer occupy different positions. The state is the debtor, and is bound by its pledge of faith to provide means and pay its debts. The treasurer is but an agent of the state, bound only to pay its debts when required to do so by a valid law. If such a law exists, and he refuses to act, a proper court will by mandamus compel him to perform his duty. If he threatens to divert money appropriated for the payment of a debt, on proper application he may be restrained. But to authorize interference in either case, it must clearly appear that he wrongfully refuses to execute a valid law, which has been enacted by the legislative department for his guidance. The court cannot make laws for him. It can only compel him to execute such as have been made.

As there is therefore no money in the treasury which the treasurer is authorized or required by any existing law to appropriate for the reimbursement of the special tax fund, we cannot restrain him from paying out the funds in his hands until the reimbursement has been made. The principal in this case cannot be reached through the agent now before the court. The bill is dismissed with costs.